# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

DANIEL M. ANDREOLA, SR.,

        Plaintiff,

    v.                                  Case No. 04-C-0186

STATE OF WISCONSIN,
ROCK COUNTY, and
ERIC RUNAAS,

        Defendants.

---

### DECISION AND ORDER

---

      This case concerns the extent to which a county jail must go to meet the religious dietary restrictions of an inmate. Plaintiff Daniel M. Andreola, Sr., brought this action against Defendants Rock County and Eric Runaas, claiming that defendants violated his right to free exercise of religion by failing to provide him with a kosher diet during the approximately nine-month period he was confined there. Andreola further claims that the defendants perpetrated a fraud on him by falsely representing to him that his meals were kosher when in fact they were not. Andreola seeks compensatory damages of $250,000 and punitive damages of $5,000,000. The State of Wisconsin has been dismissed as a defendant. Rock County and Sheriff Runaas have moved for summary judgment on all of Andreola's claims. For the following reasons, the motion will be granted, but only in part.

## BACKGROUND

On February 10, 2003, Andreola was arrested and booked into the Rock County Jail. (PFOF ¶ 1.) At that time, he advised Rock County Jail officials that he was an Orthodox Jew and that he required a kosher diet. (PFOF ¶ 6.) Andreola was the first Jewish inmate in Rock County to request a kosher diet. (PFOF ¶ 33.)

On February 11, 2003, Andreola met with Jeanne Lenox, the lead cook at the Rock County Jail, and Sgt. Candi Kildow, a Rock County Sheriff's deputy who is Jewish and keeps kosher when possible. (PFOF ¶¶ 5-8.) Kildow explained to Andreola that the jail kitchen and the foods prepared therein were not kosher.[1] (PFOF ¶ 9.) Andreola provided Lenox with a list of foods he could have. (PFOF ¶ 10.) The kitchen and jail staff thereafter provided Andreola with foods from this list. (PFOF ¶ 12.) However, Andreola repeatedly refused to eat his meals. He claimed that the meals were not kosher, and that he needed to watch the kitchen staff prepare his meals to ensure that the meals were kosher. (PFOF ¶ 12; Lenox Aff., Ex. 1.)

---

[1]Kildow's administrative report states that she provided Andreola with the following details as to why the jail kitchen was not kosher:

> Meat and dairy are kept together in the same cooler, and in the same room. The meat is not Kosher (meaning it comes from a Kosher butcher, prepared in a certain way). The same cooking utensils and pots and pans are used for both meat and dairy. The dishes are all washed in the same dishwasher. Some of the meat served is swine, which is stored in the same cooler and freezer as the other meats. The fish served here is Kosher (no bottom feeding fish), but kept in the freezer with swine. The kitchen has not been Koshered, nor can it be. Parve (neutral) items are also kept with non-Kosher items in storage. The grape juice is Kosher, but is handled by non-Jews. Also, the food is served together. No time [is] allotted between meat and dairy.

(Kildow Aff., Ex. 1.)

On February 25, 2003, Lenox and Commander Barbara Barrington decided that Andreola thenceforth would be given regular jail meals. (PFOF ¶ 13; Lenox Aff., Ex. 1.) Andreola's "kosher" diet was reinstated on June 11, 2003 (PFOF ¶ 36); however, on June 12, 2003, Andreola stated that he would not eat the meals provided because he did not consider them kosher. (PFOF ¶ 37.)

On September 1, 2003, Aramark Correctional Services, Inc., took over food preparation services for the Rock County Jail. (PFOF ¶ 16; Lidbury Aff., Ex. 1.) Andreola met with an Aramark representative, Lamont Moore, in early September to discuss Andreola's dietary needs. Andreola asked to be allowed to oversee preparation of his food in the jail kitchen. Aramark denied this request because of liability and security concerns. (PFOF ¶ 28.) Aramark did provide Andreola with "certified kosher" meals, at Rock County's expense. (PFOF ¶ 29.) Defendants contend Andreola later told Moore that he had no complaints about his "kosher" meals. (PFOF ¶¶ 30-31.) Andreola left the Rock County Jail on November 5, 2003, when he was transferred to the State of Wisconsin's correctional system. (PFOF ¶ 22.)

Andreola filed this action on February 23, 2004. He alleges that Rock County and Eric Runaas, the Rock County Sheriff, violated his right to free exercise of his religion. (Compl., Count One.) It appears from the complaint and from Andreola's response to the motion for summary judgment that he claims never to have received kosher food at the Rock County Jail, even after Aramark took over the kitchen. (Jan. 5, 2005 Aff. of Andreola ¶ 5.) Andreola also alleges that Rock County and Sheriff Runaas intentionally misrepresented to him that they were providing him with kosher meals. (Compl., Count Two.)

## ANALYSIS

Under the Federal Rules of Civil Procedure, summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

As *Celotex* makes clear, the burden that each party carries with respect to a motion for summary judgment under the federal rules varies significantly depending upon which party bears the burden of proof at trial on the issue upon which summary judgment is sought. Where the party seeking summary judgment does not bear the burden of proof at trial on any element of the claim, it is enough that it inform the court of "the basis of its motion and identif[y] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Id.* at 323. There is no requirement that a moving party who does not bear the burden of proof establish that the element does not exist. In other words, a moving party who does not have the burden of proof

4

at trial, (usually the defendant), is not required to prove a negative in order to make a prima facie showing for summary judgment. *Id.*

Once such a showing is made, however, the nonmoving party who does have the burden of proof at trial, (usually the plaintiff), must respond. In the face of a properly supported motion for summary judgment by the defendant, the plaintiff must designate specific facts to support or defend each element of the cause of action, showing that there is a genuine issue for trial. *Id.* at 322-24. Moreover, the party that bears the burden of proof at trial must show that it has admissible evidence to support its claim:

> When as in the present case a defendant moves for summary judgment on the ground that the plaintiff lacks evidence of an essential element of his claim, the plaintiff is required by Fed.R.Civ.P. 56, if he wants to ward off the grant of the motion, to present evidence of evidentiary quality–either admissible documents or attested testimony, such as that found in depositions or in affidavits–demonstrating the existence of a genuine issue of material fact. The evidence need not be in admissible form; affidavits are ordinarily not admissible evidence at a trial. But it must be admissible in content, in the sense that a change in form but not in content, for example a substitution of oral testimony for a summary of that testimony in an affidavit, would make the evidence admissible at trial.

*Winskunas v. Birnbaum*, 23 F.3d 1264, 1267-68 (7th Cir. 1994) (internal citations omitted). It is for this reason that summary judgment is referred to in federal courts as the "put up or shut up moment in a lawsuit." *Johnson v. Cambridge Industries, Inc.,* 325 F.3d 892, 901 (7th Cir. 2003) (internal quotation marks omitted).

## I. Section 1983 Claim

The First Amendment to the United States Constitution states: "Congress shall make no law respecting the establishment of religion, or prohibiting the free exercise thereof." Though plainly

5

intended to limit only Congress' power, the Supreme Court held in *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940), that the liberties guaranteed by the religion clauses of the First Amendment were embraced by the fundamental concept of liberty embodied in the Fourteenth Amendment. As a result, state and local governments are bound by the limitations contained therein, as construed by the Supreme Court. And pursuant to 42 U.S.C. § 1983, individuals claiming they have been deprived of such rights by a state or local government may sue in federal court for damages and other relief.

In this case, Andreola sued Rock County and its Sheriff, claiming that they violated his First Amendment right to freely exercise his religion. Andreola claims he is Jewish, which the defendants do not dispute, and requires kosher food as part of his religious practice. He contends that by refusing to provide him meals prepared in accordance with the dietary law of his religion, the defendants violated his constitutional rights and are liable to him under 42 U.S.C. § 1983.

The defendants contend they are entitled to summary judgment on Andreola's § 1983 claim because neither can be held liable for the alleged constitutional harm of which Andreola complains. They contend that Rock County is not liable because the alleged harm is not the result of an official policy or custom, and the Sheriff is not liable because there is no evidence that he had any personal involvement in the decisions concerning Andreola's meals. The defendants also argue that Andreola's § 1983 claim fails because the actions taken by the Rock County Jail in response to his requests were reasonable and valid. I will address each argument in turn.

## A. Claim against Sheriff Runaas

Andreola has not asserted that Sheriff Runaas had any personal involvement in decisions concerning Andreola's meals. Perusal of the complaint, the proposed findings of fact, and the

6

supporting affidavits discloses that the only individuals involved in the decision as to what sort of meals to give Andreola were Lenox, Barrington, and Moore.[2]  No indication appears that Sheriff Runaas knew or approved of what Lenox, Barrington, and Moore decided.  To recover under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right.  *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995).  An official satisfies the personal responsibility requirement of § 1983 if the conduct causing the constitutional deprivation occurs at his direction or with his knowledge and consent.  *Id.*  That is, the official must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye—in short, some causal connection or affirmative link must exist between the action complained about and the official sued in order to recover under § 1983.  *Id.*  An official is not liable, however, merely because he is a supervisor over one who commits a constitutional violation.  *Id.*  Andreola's claims to the contrary notwithstanding, the doctrine of *respondeat superior* does not apply to § 1983 actions.  *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001).  Because Sheriff Runaas was not involved in decisions concerning Andreola's meals, and did not know of and consent to the actions of Lenox, Barrington, and Moore, he is not subject to liability under § 1983.

### B. Claim against Rock County

"In litigation under § 1983 a municipality is not vicariously liable for the constitutional torts

---

[2]Andreola did move to add these and other parties to his action, and for leave to file an amended complaint after the time for discovery had expired and the defendants had moved for summary judgment.  I denied his motion in an order entered on March 2, 2005 (docket # 81), because it sought to significantly expand the scope of the action with fourteen new parties and additional claims unrelated to the original claims made here.  I also note that plaintiff was clearly aware of the role Commander Barrington and other members of the jail staff had played in this case from the beginning, *see* Complaint, Ex. 2 and 3, and no explanation has been offered as to why he waited until after discovery was closed and defendants filed their motion to seek to add the individuals.

of its employees but is answerable only for the consequences of its policies." *Dye v. Wargo*, 253

F.3d 296, 298 (7th Cir. 2001). The Seventh Circuit has held that a municipality is subject to liability

under 42 U.S.C. § 1983 only when there is

> (1) an express policy that would cause a constitutional deprivation if enforced;

> (2) a common practice that is so widespread and well settled as to constitute a custom or usage with the force of law even though it is not authorized by written law or express policy [and that practice causes a constitutional injury]; or

> (3) an allegation that a person with final policy-making authority caused the constitutional injury.

*Lawrence v. Kenosha County*, 391 F.3d 837, 844 (7th Cir. 2004). Municipalities may not be held

liable under a theory of *respondeat superior. Oklahoma City v. Tuttle*, 471 U.S. 808, 818 (1985).

Andreola has offered no evidence that he was denied kosher meals pursuant to an express

policy of Rock County. Decisions regarding Andreola's diet were made on an informal, *ad hoc*

basis by jail staff. Nor was denial of kosher meals a common practice in Rock County–Andreola

was the first Jewish inmate in Rock County to request a kosher diet. Andreola has not identified

any person with final policy-making authority who caused his alleged constitutional injury. The

persons with final decision-making authority in Rock County include the county's elected officials,

*see, e.g., Soderbeck v. Burnett County*, 752 F.2d 285, 292-3 (7th Cir. 1985) (holding that committee

made up of members of county's board of supervisors comprised persons with final policy-making

authority for whose actions county was liable under § 1983), but do not include Lenox (a cook),

Barrington (the commander of the Rock County Jail) or Moore (an employee of a food services

contractor), all of whom were lower in the chain of command. Rock County cannot be held liable

for their actions under § 1983.

Having found that neither the County nor the Sheriff can be liable for the constitutional violation alleged by Andreola, it follows that the defendants are entitled to summary judgment on Andreola's § 1983 claim. In addition to these reasons, however, and as an alternative basis for granting the defendants' motion, I will proceed to address his First Amendment claim on its merits.

### C. Free Exercise Claim

The fact that Andreola was lawfully confined in a county jail is not dispositive of his claim. It is true that "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston*, 334 U.S. 266, 285 (1948). Obviously, a prison is not required to release a Catholic prisoner to attend Sunday Mass or a Muslim prisoner to make a pilgrimage to Mecca. However, the Supreme Court has also held that "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). In this context, the legitimate penological objectives include "the preservation of internal order and discipline, [and] the maintenance of institutional security against escape or unauthorized entry." *Procunier v. Martinez*, 416 U.S. 396, 412 (1974).

When an inmate challenges a prison or jail regulation or policy on the ground that it deprives him of rights guaranteed by the Constitution, the court must ultimately decide whether the challenged regulation or policy is valid. But in doing so, courts are called upon to give substantial deference to the considered judgment of prison administrators "who are actually charged with and trained in the running of the particular institution under examination." *Bell v. Wolfish*, 441 U.S. 520, 562 (1979). In *Turner v. Safley*, 482 U.S. 78 (1987), in order to ensure that the judgment of

9

prison officials was accorded appropriate deference, the Court adopted a reasonableness test by which to determine the validity of prison regulations that are alleged to violate a prisoner's constitutional rights. In contrast to the "strict scrutiny" test that was normally applied to government enactments alleged to impinge on fundamental constitutional rights, *Turner* held such a regulation would be upheld "if it was reasonably related to legitimate penological interests." *Id.* at 89. *Turner* also set out four factors to consider in making this determination: "First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Id.* (*quoting Block v. Rutherford*, 468 U.S. 576, 586 (1984)). The second factor to consider is "whether there are alternative means of exercising the right that remain open to prison inmates." 482 U.S. at 90. The third factor is "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Id.* And finally, the presence or absence of ready alternatives that fully accommodate the prisoner's rights at *de minimis* cost to valid penological interests. *Id.* at 90-91.

In *Turner*, the Court was confronted with a prisoner's challenge to restrictions on the right of inmates to correspond with other inmates and to marry, neither of which are at issue here. However, in *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987), a group of Islamic prisoners challenged a policy adopted by prison officials that interfered with their attendance at Jumu'ah, a weekly Muslim congregational service commanded by the Koran. Applying the test it had set out in *Turner* only a week earlier, the Court found that the policy had a logical connection to the institutional interest in maintaining institutional order and security since it was designed to ease tension and the drain on the facilities and personnel during that part of the day when the inmates were outside the main building. The Court noted that "the very stringent requirements as to the time

10

at which Jumu'ah may be held make it extraordinarily difficult for prison officials to assure that every Muslim prisoner is able to attend that service." *Id.* at 351. While it did not minimize the importance of Jumu'ah to Muslim prisoners, the Court nevertheless concluded that the fact that other ways of exercising their religion remained open to them supported its conclusion that the challenged regulation was reasonable. Finally, the Court concluded that accommodation of the Muslim prisoner's request would have an adverse impact on other inmates, on prison personnel, and on allocation of prison resources. Reaffirming its "refusal, even where claims are made under the First Amendment, to substitute our judgment on . . . difficult and sensitive matters of institutional administration, . . . for the determination of those charged with the formidable task of running a prison," the Court concluded that the regulations were reasonably related to legitimate penological objectives.

The Supreme Court has yet to rule on whether prisons are required under the First Amendment to provide inmates meals that meet the specific requirements of their religion. However, many lower courts have. Several cases held that inmates are entitled to "food sufficient to sustain them in good health that satisfies the dietary laws of their religion." *McElyea v. Babbitt*, 833 F.2d 196, 198 (9th Cir. 1987). *See also Kahane v. Carlson*, 527 F.2d 492, 495 (2d Cir. 1975) ("The courts have properly recognized that prison authorities must accommodate the right of prisoners to receive diets consistent with their religious scruples."). Although *McElyea* and *Kahane* were decided prior to *Turner*, in *Beerheide v. Suthers*, 286 F.3d 1179 (10th Cir. 2002), a post-*Turner* case, the Tenth Circuit affirmed the district court's decision and injunction requiring state department of corrections to provide plaintiff inmates a "diet that complies with the kosher dietary

11

requirements of Orthodox Judaism at no cost to Plaintiffs." In *Beerheide*, the court noted that "keeping kosher" includes:

> adherence to specific rules concerning which foods may be eaten and which are forbidden. Foods that may be eaten include all non-animal products such as fruits and vegetables, meat from animals without cloven hooves including cows and sheep, and fish which have fins and scales. "Kosher" also dictates specific methods by which allowable foods are prepared for consumption. For example, kosher food is no longer "kosher" if it is prepared in containers which have held non-kosher food. To keep kosher foods untainted, containers, pots and pans, utensils, and all other implements used in their preparation must not come into contact with any item that is or has had contact with nonkosher food. Also, to keep kosher food "kosher," it must be served on plates and bowls and eaten with utensils which have not had nonkosher contact.

286 F.3d at 1183. Complying with the district court's preliminary injunction in that case entailed setting up a modified kosher kitchen within the regular prison kitchen staffed by one the plaintiffs. Despite this fact and the district court's finding that providing eligible inmates with kosher meals would cost $13,000 per year (out of an annual food service budget of $8.25 million), the *Beerheide* court rejected the defendant's argument that its policy against providing kosher diets was justified by budgetary concerns and the responses of other inmates to special treatment and affirmed the district courts decision and order.

Notwithstanding the Tenth Circuit's decision in *Beerheide*, most courts that have addressed the issue since *Turner,* while suggesting that some accommodation might be required, have rejected prisoner claims that they are entitled to a meals prepared in strict accordance with the dietary laws of their religion. As one court faced with a similar claim by a Muslim prisoner concluded from its own review of the decisions of the various courts that had addressed the issue, "the vast majority of these courts ha[ve] determined that a prison permissibly discharge[s] its constitutional duty to respect the dietary beliefs of Muslim inmates by offering an alternative, pork-free diet, and more

12

broadly, that the law permit[s] prison authorities to limit the dietary options available to prisoners in the interests of reducing the costs and burdens entailed in accommodating the smorgasbord of food-related religious beliefs likely to be encountered in a prison population." *Hudson v. Maloney* 326 F. Supp.2d 206, 211 (D. Mass. 2004).

In *Kahey v. Jones*, 836 F.2d 948, 949 (5th Cir. 1988), for example, the Fifth Circuit was confronted with a prisoner's demand "to have the prison prepare not just a non-pork diet, but a specially-tailored menu in a special way to accommodate her practice of Islam." In rejecting the prisoner's claims, the Fifth Circuit reaffirmed its pre-*Turner* holding in *Udey v. Kastner*, 805, 1218 (5th Cir. 1986), "that prisons need not respond to particularized religious dietary requests." 836 F.2d at 950. In *Udey*, the court had held that the prison was justified in denying the prisoner's request for a diet consistent with his religious beliefs based on "the probable proliferation of claims, and the concomitant entanglement with religion that processing multiple claims would require." 805 F.2d at 1220. As the *Kahey* court explained:

> if one such dietary request is granted, similar demands will proliferate, with two possible results: either accommodation of such demands will place an undue burden on the prison system, or the prisons would become entangled with religion while drawing fine and searching distinctions among various free exercise claimants.

836 F.2d at 950. In reaffirming *Udey*, the *Kahey* court analyzed the issue in light of the factors highlighted by the Court in *Turner*. First, the court noted that the regulation served "a legitimate governmental interest in running a simplified prison food service rather than a full-scale restaurant." *Id*. Second, the court noted that, as in *O'Lone*, other forms of exercising her religion were available. *Id*. at 951. With respect to the potential impact on guards, other inmates and the allocation of prison resources, the court noted that the prison was "understandably reluctant not only to provide special

13

food, but to devote special storage facilities, utensils and preparation effort to supplying Kahey's diet." *Id.* As similar requests arose, the court noted, "the expense and diversion of resources from other penological goals could be considerable." *Id.* This could result in the perception among other inmates that Kahey was being favored which would have an adverse impact on prison morale. In light of these considerations and since the cost of the alternative Kahey had suggested – providing food in hulls or shells served on paper plates – would not be *di minimus*, the court concluded the prison official's refusal to accede to the prisoners demands was reasonable. *Id. See also Williams v. Morton*, 343 F.3d 212 (3rd Cir. 2003) (holding failure to provide Halal meals to Muslim inmates did not violate their free exercise rights).

The law in this circuit appears similar. In *Hunafa v. Murphy*, 907 F.2d 46 (7th Cir. 1990), the Seventh Circuit reversed the district court's summary judgment dismissing the claim of a Muslim prisoner that his free exercise rights were violated when the prison officials failed to take adequate precautions to insure that the non-pork meals served to him when he was placed in segregation were not contaminated by the pork served to non-Muslim inmates during transit to the cells.[3] In so ruling, the court cited the Fifth Circuit's decision in *Kahey*, but distinguished it, noting that the prisoner's demands in that case were "far more taxing than Hunafa's appear to be," 907 F.2d at 47, and that "the defendants advanced detailed objections based on cost and feasibility." *Id.* at 48. The court concluded the record before it was insufficient to permit an evaluation of the magnitude of the concerns advanced by the prison officials:

---

[3]The court noted that *Employment Division v. Smith*, 494 U.S. 872 (1990), "cut back, possibly to minute dimensions, the doctrine that requires government to accommodate, at some cost, minority religious preferences," and commended the issue to the parties and the district court on remand. *Hunafa*, 907 F.2d at 48. Thus, it is unclear whether the Seventh Circuit would reach the same result on a full record.

the benefit of the practice to the prison must be weighed against the cost to the inmate of having to give up several meals a week in order to avoid defilement considerably more palpable than what prisoner Kahey sought to avoid. She wanted to be sure she did not eat any food that had been cooked or served in or on utensils that had ever come into contact with pork, and this would have required "special food and individualized processing and containers," [836 F.2d] at 949-50, which the court thought too much. The prison concerns here are different and for all we know greater, but they have not been elaborated and the prisoner's claim of contamination is stronger. On this record, which consists essentially of a brief affidavit filed by the prison's food administrator that summarizes the prison's concerns but makes no attempt to estimate their magnitude in relation to the plaintiff's religious claims, the balance is too close for summary judgment to be proper.

907 F.2d at 48.

Here, the record reflects that Andreola's request for a kosher diet was, like the plaintiffs in *Beerheide*, a request for a diet in accordance with specific rules that determine not only what foods are to be provided but also how they must be prepared.[4] In this respect, Andreola's demands were essentially the same as the Muslim inmate's in *Kahey*. Despite the fact that the jail provided him meals consisting of those items he had informed the cook he could eat, he continued to return his trays to the kitchen "because he did not like the way they looked." (Lenox Aff., Ex. 1) He stated

---

[4]Shortly after his arrival, Andreola sent a note to jail commander in which he set forth the requirements for a kosher meal for an observant Orthodox Jew:

1. All items must be sealed by manufacturer and contain a Kosher seal.
2. All Food items sealed must by opened only by me.
3. All items warmed up or heated must be done so [sic] in the original sealed container.
4. All utensils used in consumption of Food must be new or cleaned and resealed by me, i.e., fork, knife, spoon.
5. Fresh fruit does not need to be sealed.

(Knudson Aff., Ex. 1 at 117.)

It is at least questionable whether Andreola would have been able to keep kosher even if he was not confined in the Rock County Jail. As Sgt. Kildow explained, "When I am not at home, I do not keep strict Kosher, as it is impossible outside of Milwaukee or Chicago. (Kildow Aff., Ex. 1.)

Case 1:04-cv-00186-WCG   Filed 09/02/05   Page 15 of 25   Document 83

he had to be allowed to come to the kitchen to watch the kitchen staff prepare his meal in order for him to tell if it is indeed kosher. (*Id.*) In light of this demand and given his refusal to accept the special meals the jail kitchen staff had previously prepared, Andreola was returned to a "regular jail meal" on February 25, 2003.

When the cook revisited the issue with him in June, Andreola complained that his food was not being served in a proper container according to his religion, even though he had originally asked that it not be served in special containers so as to cause him to stand out from other inmates. (Lenox Aff., Ex. 2.) In response to the cook's pointing out his earlier request, Andreola said he had changed his mind since everyone in his unit knew he was Jewish anyhow. Andreola also complained that the kosher food he was served was bland and he received the same thing all the time. By way of example, Andreola claimed that he had eaten rice seven times during Passover, even though jail records showed that it had been served only twice over that time. Finally, when the cook again asked him what he would be willing to eat, Andreola listed "mashed potatoes, rice, pasta, soy products, fresh vegetables and frozen vegetables." (*Id.*) When the cook reminded Andreola that when she had first interviewed him he claimed he could not eat fresh vegetables, he stated "I can't eat the fresh vegetable because the knife used to cut them was not kosher." (*Id.*) And when, in response to his request for sauce on his pasta, the cook offered to give him tomato sauce or whatever was available in the kitchen, Andreola responded, "forget it I don't want it then." (*Id.*) In response to the cook's question as to what he had been eating, Andreola responded that he had been eating the regular meals sent to the unit. (*Id.*)

In any event, the record reflects that the jail kitchen staff continued its effort to accommodate Andreola's dietary requests by providing him food items he stated he could eat. (Knutson Aff., Ex.

16

1.)  However, it apparently did not prepare his meals in the manner he requested.  The County did not purchase a separate refrigerator, stove, microwave, or separate containers and utensils for storing, preparing and serving his food; nor did it allow Andreola to observe the preparation of his food.  As a pretrial detainee awaiting trial and then a convicted prisoner awaiting sentencing and later transfer to a state facility, Andreola was not eligible under the jail's classification system to serve as a trustee, and only trustees were allowed to work in the kitchen.  (Barrington Aff. ¶¶ 7-11.)  Although consideration was given to ordering kosher meals from third party vendors, the cost of such meals ranged between $3.86 and $11.99 per meal, which Barrington concluded was too high and had not been anticipated in the budgeting process for 2003.  (*Id.* ¶¶ 13-15; DPFOF ¶ 19.)  Moreover, storing, refrigerating and heating precooked meals would still have been done in the same kitchen and using the same appliances in which the non-kosher food for the other inmates was stored, refrigerated and cooked.  Despite these difficulties, when the County later contracted with Aramack Correctional Services to provide the food service for the jail beginning in September 1, 2003, it paid for special kosher meals for Andreola provided by a separate vender at a cost of $3.86 per meal.  (Moore Aff. ¶¶ 5, 6.)  This was more than four times the cost Aramack charged for meals provided other inmates.  Notwithstanding this fact, Andreola claims that the food he received even after Aramack took over the food service for the jail, was not kosher.

Andreola is less than clear as to how the County failed to provide a diet that complied with the dictates of his religion.  He does not dispute the specific facts asserted by the defendants as to what foods he was given; no where in his submissions, for example, does he claim that he was given pork or that the kinds of food he was provided were improper.  I therefore construe his claim to be that it was the preparation and handling of his food that was not in accordance with the tenets of his

17

faith; in other words, that it was not kept completely separate from non-kosher food and prepared with separate appliances and utensils. Thus construed, I conclude on the record before me that the defendants are entitled to summary judgment on Andreola's First Amendment claim under § 1983. The County officers and employees made a reasonable effort to accommodate Andreola's right to exercise his religion. To the extent they did not meet all his demands, I find that their failure to do so was reasonably related to legitimate penological interests based on consideration of the four factors identified in *Turner.*

The first *Turner* factor is that the regulation or conduct must be a valid, rational relation between the regulation or conduct and a legitimate governmental interest. The Rock County Jail had an over-capacity daily population of approximately five hundred inmates throughout the time Andreola was there. (DPFOF ¶ 32.) Obviously, a food service plan for a population this size must be designed to prepare and serve nutritious meals three times a day in as efficient and cost-effective a way as possible in a secure setting. It is the County's taxpayers, after all, who must pay for the food and housing required for this population, and since it is the inmates who bear full responsibility for their being there, those taxpayers are justifiably reluctant to spend more than is necessary to care and feed them. In addition, because the population being fed poses significant security concerns, limiting their access to food preparation areas where potentially dangerous implements, such as sharp knives, are readily available is especially important. In this case, unlike *Hunafa*, and like *Kahey*, Andreola was insisting on food that had been handled and prepared in strict accordance with the dictates of his religion. In essence, Andreola's claim is that the County should have provided a separate kitchen for storing, preparing and serving his meals, and that he should have been allowed to at least supervise, if not actually run it. The County's refusal to accede to his demands

18

was reasonably related to its interests in maintaining security and operating its jail efficiently at a reasonable cost. These are legitimate penological interests.

With respect to the second *Turner* factor, the record reflects that the County took significant steps to accommodate other ways in which Andreola sought to exercise his religion. The jail made special arrangements to allow Andreola delivery of religious material. It established a schedule that allowed Andreola to leave his cell at specified times for prayers and made special arrangements for him to observe Sukkot and Yom Kippur. (DPFOF ¶¶ 15, 23-26.) Like the Muslims in *O'Lone*, Andreola remained free to engage in other religious practices and expression. His ability to participate in other religious observances of his faith and to exercise his religion in other ways "supports the conclusion that the restrictions at issue here were reasonable." *O'Lone*, 482 U.S. at 352.

Consideration of the remaining factors also support this conclusion. Accommodating Andreola's demands would have had a significant impact on other inmates, jail personnel and the allocation of jail resources generally. Time and effort spent acceding to Andreola's demands was time that could not be spent seeing to other inmate needs. In addition, "[p]erceived special treatment of one prisoner by others can cause resentment among inmates and be a source of friction among inmates." (DPFOF ¶ 20.) The expense of setting up a separate kosher kitchen would have diverted resources from other needs of the jail and the County. And allowing Andreola to supervise preparation of his food, despite the fact he was not eligible to serve as a trustee, would undermine the authority of the jail officials and their ability to maintain security. Finally, acceding to Andreola's demands by providing separate facilities for the storage and preparation of his meals would place far more than a *de minimus* burden on the jail staff and budget.

19

In sum, I conclude that Andreola's § 1983 claim fails because the jail officials made reasonable efforts to accommodate his right to exercise his religion under the circumstances and, to the extent they failed to provide meals in full conformity with the dietary laws of his religion, the failure was reasonably related to legitimate penological interests. For this reason and because there is no evidence of either a County policy or personal involvement by Sheriff Runaas behind the decisions that Andreola claims violated his right to exercise his religion, summary judgment will be granted on Andreola's § 1983 claim.

## II. RLUIPA claim

Andreola argues in his response to defendants' summary judgment motion that he has stated claims under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc *et seq.*, and not merely under § 1983. (Pl.'s Resp. at 2.) Defendants object to the assertion of claims under RLUIPA, because the court denied Andreola's motion to file an amended complaint that would have explicitly asserted such claims as a separate count. (Def.'s Reply at 1.) However, the Federal Rules of Civil Procedure do not require Andreola to specify the statutes under which he seeks to recover in his complaint. *Shah v. Inter-Continental Chicago Hotel Operating Corp.*, 314 F.3d 278, 282 (7th Cir. 2002) ("The plaintiff is not required to plead facts or legal theories or cases or statutes, but merely to describe his claim briefly and simply."); *see also Ryan v. Ill. Dep't of Children and Familys Services*, 185 F.3d 751, 764 (7th Cir. 1999) (holding that it is acceptable for plaintiff to wait until response to summary judgment motion to identify legal theory). Since the

facts alleged in the complaint may state a claim under RLUIPA as well as under § 1983, I will

analyze Andreola's claim under RLUIPA.[5]

Apparently dissatisfied with the Supreme Court's holding that prison officials should be

accorded substantial deference in their evaluation of the penological interests that must be weighed

against inmates' interest in the exercise of their religion inside the nations prisons and jails,

Congress passed RLUIPA, which in effect overruled the Court's decisions in *Turner* and *O'Lone*

as they apply to prison regulations or policies that impact on the religious practices of inmates.  In

*Turner*, to repeat, the Court ruled that in order to ensure that courts afford appropriate deference to

prison officials, prison regulations alleged to infringe constitutional rights would be judged under

a reasonableness standard – "the regulation is valid if it is reasonably related to legitimate

penological interests." *Turner*, 482 U.S. at 89.  In enacting RLUIPA, Congress decided that inmates

of any prison or jail that receives federal funds inmates should be allowed judicial relief from any

governmental regulation or action that imposes a substantial burden on their right to exercise their

religion unless the prison or jail proves that the burden on the inmate: "(1) is in furtherance of a

compelling governmental interest; and (2) is the least restrictive means of furthering that compelling

governmental interest." 42 U.S.C. § 2000cc-2.  As a result, under RLUIPA, it is no longer enough

for prison or jail officials to show that a challenged regulation is reasonably related to a legitimate

penological interest; under RLUIPA they must show that a compelling governmental interest

requires it and that no less restrictive alternatives are available.

---

[5] The Supreme Court upheld the constitutionality of RLUIPA this past term in *Cutter v. Wilkinson*, 125 S. Ct. 2113 (2005).

21

Andreola claims that § 2000cc-1(a) applies in this case because Rock County "receive[s] Federal Funds for prisoners." (Pl.'s Resp. at 2.) The defendants have not addressed this issue since, in their view, no RLUIPA claim is presently before the court. I will therefore assume for present purposes that RLUIPA applies. With that assumption in mind, I conclude that summary judgment on this claim is not appropriate, given the present state of the record.

The need to justify its actions by a "compelling governmental interest" places a high burden on the County. Fashioned by the Supreme Court to insure that governmental action that impinges on the fundamental rights of individuals or impacts adversely upon a suspect class is subjected to strict scrutiny, *San Antonio School District v. Rodriguez*, 411 U.S. 1, 16 (1973), the "compelling interest" standard requires a significantly stronger justification than the reasonableness test adopted by the Court in *Turner.* In *Employment Division v. Smith*, 494 U.S. 872, 886 (1990), the Court noted that if all laws challenged on free exercise grounds were subjected to this standard, many "would not meet the test." "Any society adopting such a system," Justice Scalia commented in his decision for the majority, "would be courting anarchy." *Id. See also Agrawal v. Briley*, 2004 WL 1977581 at * 8 (N.D. Ill) (granting summary judgment RLUIPA claim in favor of prison inmate denied religious diet).

Here, defendants have made no effort to establish a compelling governmental interest and instead have argued simply that the efforts made to accommodate Andreola's religious dietary laws were reasonable. Given the high burden placed upon the County by RLUIPA and the fact that the defendants have not addressed its applicability or the standard it imposes, I conclude that it would be improper to grant summary judgment on this claim at this time. Accordingly, the parties will be given an opportunity to address this aspect of the case further.

22

## III. State law claim

Andreola's remaining claim–that defendants intentionally misrepresented to him that they were providing him with kosher meals–arises under Wisconsin law. To establish fraud under Wisconsin law, a plaintiff must prove the following five elements:

(1) The representation must be of a fact and made by the defendant;

(2) the representation of fact must be untrue; and

(3) the plaintiff must believe such representation to be true and rely thereon to his damage.

4) the defendant must have made the misrepresentation with knowledge that it was false or recklessly without caring whether it was true or false; and

5) the defendant must have made the misrepresentation with intent to deceive and to induce the plaintiff to act on it to his detriment or damage.

*Tietsworth v. Harley-Davidson*, 677 N.W.2d 233, 239 (Wis. 2004).

Here it is less than clear that anyone ever represented to Andreola that his meals were in fact kosher, as he understood the term. In fact, as previously noted, the evidence establishes that Sgt. Kildow explained to him when he first requested a kosher diet that, for a variety of reasons, the jail kitchen and the foods prepared therein were not kosher. Although Andreola alleges that his meal trays were marked "special diet" and "kosher diet" (Compl.¶ 6, Ex. 1), the evidence shows that, insofar as the jail staff knew, it was providing Andreola kosher meals. They obviously did not share Andreola's detailed knowledge of what "keeping kosher" actually meant. It is also likely that the labels placed on his tray were simply to let the trustees who delivered the meals know which tray was to go to Andreola. From the evidence before me, then, there is no reason to think that jail staff intentionally misrepresented the character of the food they were giving him.

23

But Andreola's fraud claim suffers from a more obvious defect. According to his own complaint, he did not rely upon the representations he alleges the defendants made. He alleges that from the time he arrived at the jail until he left he was denied a kosher diet despite his repeated demands. In other words, even if defendants had represented to Andreola that his meals were kosher, and that representation were false, the record makes it abundantly clear that Andreola did not rely on defendants' representation. Andreola refused his meals and claimed they were not kosher.

In an effort to show reliance, Andreola claims in his response to the summary judgment motion that other inmates "believed that [he] was receiving a special meal and therefore harassed [him] about this special meal." (Pl.'s Resp. at 5.) But the other inmates are not plaintiffs in this action. Thus, the fact that they may have thought Andreola was getting kosher meals is of no import. Because the evidence establishes clearly that Andreola did not rely on the representations allegedly made by the defendants, summary judgment will be granted on his fraud claim as well.

**CONCLUSION**

Based on the undisputed facts before me, I conclude that Andreola's First Amendment and fraud claims against Rock County and Sheriff Runaas are without merit and should be dismissed. Accordingly, the defendants' motion for summary judgment will be granted, but only in part. For the reasons stated above, Andreola's claim under RLUIPA remains. The clerk shall set this matter for a telephone conference to address further scheduling.

24

**IT IS THEREFORE ORDERED** that defendants' motion for summary judgment is hereby **GRANTED**, but only in part.

Dated this ___2nd___ day of September, 2005.

s/ William C. Griesbach
William C. Griesbach
United States District Judge